**WESTINGHOUSE ELECTRIC CORPO-
RATION, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**No. 73–2476.**

United States Court of Appeals,
Fourth Circuit.

Argued May 1, 1974.

Decided Nov. 4, 1974.

Arthur McM. Erwin, Spartanburg, S. C. (Thomas C. Bradley, Jr., and Erwin & Bradley, Spartanberg, S. C., on brief), for petitioner.

William L. Corbett, Atty., N. L. R. B. (Peter G. Nash, Gen. counsel, John S. Irving, Deputy Gen. counsel, Patrick Hardin, Associate Gen. counsel, Elliott Moore, Deputy Associate Gen. counsel, and Alan D. Cirker, Atty., N. L. R. B, on brief), for respondent.

Before HAYNSWORTH, Chief Judge, and RUSSELL and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

This petition seeks to review and set aside an order of the National Labor Relations Board (Board) which held that Westinghouse Electric Corporation (Westinghouse) violated §§ 8(a)(5) and (1) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(5) and (1), by refusing to recognize the union as the bargaining agent for certain employees, and by unilaterally changing terms and conditions of employment for such employees without notifying and bargaining with the union which represented a bargaining unit at Laurel, Maryland. The NLRB cross-petitions for enforcement of the order. Jurisdiction is present under §§ 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f).

The sole question on this appeal is whether a satellite service center established by Westinghouse at Manassas, Virginia was an accretion to the existing bargaining unit of servicemen located at Laurel, Maryland. The Board's determination that the weight of the evidence supported a finding of accretion, of course, cannot be rejected unless arbitrary or capricious. NLRB v. Aerovox Corp., 390 F.2d 653 (4th Cir. 1968). Because we conclude that the Board's conclusion is contrary to a more recent Board decision which we think requires a different standard than was applied here, we are of opinion that the Board's determination was arbitrary, decline to enforce the order, and accordingly set the order aside.

The dispute arose in 1971 when Westinghouse decided to establish a satellite customer service facility at Manassas, Virginia, which was sixty miles away from a branch facility at Laurel, Maryland.[1] Employees from the Laurel facility had been servicing Westinghouse customers in Washington, D. C., part of Maryland, including Baltimore, and part of Northern Virginia, while the bulk of the Northern Virginia area was serviced by independent contractors performing the service for Westinghouse under the administrative control of the Richmond area manager. Westinghouse determined that the Manassas facility was necessary because of numerous complaints about the service received from the independent contractors, plus the fact that the growth of Northern Virginia justified use of its own employees and facilities for such service. Also, the Laurel facility was too far away to efficiently and economically provide parts, and too small to handle the increase in warehousing space and administrative space needed for the growth in the Northern Virginia area. The independent contractors were to be replaced by Westinghouse after proper cancellation notice to each. The General Counsel does not contest that legitimate business reasons existed for the establishment of the Manassas facility or that it was for these reasons it was so established.

The Laurel service employees were members of the International Brotherhood of Electrical Workers, AFL–CIO, Local Union No. 1446 (union). The bargaining unit certified for these employees, in Article I of the collective bar-

---

1. A satellite service operation typically has from three to ten service technicians plus a supervisor and clerical worker, and has storage and warehouse facilities. A branch service operation has more than ten technicians, full administrative facilities and personnel, supervisory personnel, warehouse and storage facilities, and is operated under the control of a branch service manager. Nowhere in the Westinghouse service system, as hereinafter pointed out, is a satellite un-

der a branch facility. A satellite is rather under the administrative control of an area facility and an area service manager. The area facility has an area manager who has under his administrative control satellite facilities, independent contractors who perform service, and servicing dealers who perform service. He has no repair personnel under his immediate supervision but is responsible for the service in a geographic area.

gaining agreement between Westinghouse and the union, is as follows:

> "All servicemen, including senior servicemen and shop servicemen, employed by Westinghouse Appliance Sales at the Baltimore/Washington, D. C. distribution center located at Laurel, Maryland; excluding all other employees, clerical employees, salesmen, guards, and supervisors as defined in the Act."

Pursuant to its plans, Westinghouse, in January, 1972, increased the number of servicemen at Laurel from 33 to 38, and changed the personnel numbers of five experienced Laurel servicemen, all of whom worked in the Northern Virginia area covered by Laurel, so that their work was charged to the Manassas budget. In April, 1972, Westinghouse transferred a supervisory employee from its Akron, Ohio facility to become the satellite service supervisor at Manassas; also, on April 24, it notified the five designated servicemen at Laurel of their prospective assignment to Manassas effective May 15. Although it was aware of the company's plans, the union had not been directly informed concerning the new facility and transfers at this date, and the five employees affected were told that it would be their choice whether the new Manassas location was unionized or not. These employees were officially detached from Laurel and assigned to Manassas on May 15, 1972, at which time they received a slight increase in pay because all Manassas employees were paid under the Westinghouse salaried employee plan, as opposed to their former status as hourly employees under the collective bargaining agreement at Laurel. The increase in pay was due to the fact that on May 15 all Westinghouse salaried employees, nationwide, both union and non-union, received a 4% wage increase.

On July 10, 1972, two more servicemen were transferred from Laurel to Manassas, and, in December, 1972, two additional servicemen were hired who had never worked at Laurel.

The union first complained to Westinghouse by letter on July 3, 1972, noting that checkoff dues for the five transferred employees had not been received, and that the Manassas employees had received wage and benefit improvements not received by those at Laurel. Westinghouse responded that Manassas employees were outside the certified bargaining unit, and that the service operation at Manassas was geographically separate and distinct, and both separate and independent with regard to organization, administration, and operation. Shortly thereafter, the charges involved in this case were filed by the union.

The organization of the Westinghouse Consumer Service Division is such that there are six regional service managers within the Division, each one reporting to the National Manager of Field Service. Laurel and Manassas are both in the Eastern Region, which covers (in whole or part) the territory from Maine to North Carolina. Reporting to the Eastern Regional Service Manager are three branch service managers, including the one at Laurel, and six area service managers. The Manassas satellite was one of three satellites assigned to the responsibility of the area service manager at Richmond, Virginia, the other two satellites being located at Norfolk and Richmond. As previously explained, branch operations are typically much larger than satellites. A significant difference between the jobs done by branch service managers and area service managers is that area managers are responsible for work done by independent contractors and servicing dealers, in addition to that done by Westinghouse service satellites, while branch managers are responsible only for their respective branches. A substantial part of the area under the Manassas service satellite was formerly under the Richmond area manager serviced by independent contractors. No branch service office has any satellite under its control. All satellites are under the control of area service offices, those in the Eastern Region

being at Richmond, Hartford, Syracuse, Harrisburg and Philadelphia.

Basically, Westinghouse service employees' duties consist of repairing Westinghouse appliances in the customer's home or in apartment houses. Each serviceman uses a company truck which he is allowed to keep at home during off work hours. There were two "drop points" which the Laurel servicemen used, one at Alexandria, Virginia, and the other at College Park, Maryland, and a serviceman typically begins his workday by driving his truck to a designated drop point where he receives assignments for the day, leaves orders for parts, and picks up previously ordered parts. The servicemen are largely unsupervised; they physically report to the Manassas facility (as they did at Laurel) only once a month for a servicemen's meeting, although they do make daily or more frequent telephone calls to a dispatcher to report on completed jobs. The repairmen call in after every second job. Messages to and from their immediate supervisors are also conveyed via these telephone reports.

Control of the Alexandria drop point was shifted from Laurel to Manassas after the Manassas facility opened, and Laurel servicemen no longer used it. Of the first five servicemen transferred, four used the Alexandria drop point when previously assigned to Laurel, and all five used it after their assignment to Manassas. Two later-hired servicemen, who lived nearer Manassas than Alexandria, used the Manassas facility itself as a drop point.

The five employees transferred all worked in Northern Virginia when previously assigned to Laurel, and the record shows that at least one serviceman occasionally made calls in Maryland. The five worked exclusively in Northern Virginia after their transfer to Manassas. The area of responsibility serviced by Manassas initially included all the area in Northern Virginia previously served by Laurel (all of the Ar-lington and Fairfax counties and parts of Prince William, Loudon, and Fauquier), plus possibly some additional territory. The Manassas area of responsibility did grow, as contemplated by Westinghouse, so that four months after opening and at the time of the hearing, thirteen months thereafter, it included the original territory plus the rest of Prince William, Loudon, and Fauquier counties, all of Stafford, and parts of Culpepper, Rappahannock, Madison, Spotsylvania, and Orange counties. A portion of the service calls in the expanded area were still being made by servicemen from independent contractors. None of the transferred servicemen moved his residence as a result of the assignment to Manassas.

On these facts, the Administrative Law Judge and the Board (which adopted the judge's opinion without change of consequence here) found the Manassas operation to be an accretion to the certified unit at Laurel. The Board relied on the facts that all but two of Manassas' first nine employees came from the certified unit at Laurel, that most of Manassas' initial area of responsibility and much of its subsequent area was formerly serviced from the Laurel facility, and that the Manassas employees do substantially the same work with the same tools and in much the same area that they did before the transfer. The Board discounted the fact that the Manassas facility is sixty miles from the Laurel facility because the servicemen did not report to Manassas except for the monthly meeting, and most of the Manassas servicemen use the same drop point as before. Also relied on was the fact that no serviceman had to change his residence as a result of the transfer.

The Board was not impressed by the autonomous aspects of the two operations, noting that the servicemen have very limited contact with their superiors anyway, and that both operations are under the Eastern Regional Service Manager, and the same Industrial Rela-

tions Manager handles labor relations for both facilities (as he does for all Westinghouse operations nationwide). No weight was given to the company's contention that, of the 24 branches and satellites with union contracts (out of 72 total branches and satellites), none of these contracts covered more than one location, satellites having their own union. The Board also gave no consideration to the fact that, in the entire Eastern Region, at least (the balance of the country is not disclosed by the record) no satellite facility is under the administrative control of a branch manager.

After finding an accretion and the §§ 8(a)(5) and (1) violations which necessarily followed from the company's refusal to consult the union prior to transferring the employees and its refusal to recognize the union at Manassas, Westinghouse was ordered to essentially honor the Laurel collective bargaining agreement at the Manassas facility and to cease changing terms and conditions of employment without giving the union prior notice and an opportunity to bargain.

We think the Board should have applied the same reasoning here that it did in a later case, Pilot Freight Carriers, Inc., 208 NLRB 138 (1974). There, the Teamsters union contended that Pilot's four terminals located in the State of Florida, and not covered by the national collective bargaining unit in the parties' agreement, were accretions. The Board noted the variety of factors considered in determining whether a new facility is an accretion, such as "the integration of operations, centralization of managerial and administrative control, geographic proximity, similarity of working conditions, skills, and functions, common control over labor relations, collective-bargaining history, and interchange of employees." 208 NLRB at 139 (1974 CCH NLRB § 26,200, p. 33,838). The Board then held that, although the functional

integration present in Pilot's operation pointed toward finding an accretion, such integration was "overwhelmingly counterbalanced" by "factors which show the Florida operations as a whole, or as separate terminals, to be separate appropriate units." Specifically, the Board found no interchange or transfer of employees between the Florida region and other regions; the Florida operation was substantially autonomous with its own administrative and supervisory personel; the Florida employees are paid differently from Pilot employees elsewhere; and the Florida operation was geographically separated from the rest of the Pilot system. Equally as important, the Board held that extension of the contract might ". . . do serious violence to the mandate that employees' rights are to be protected and that appropriate unit findings under § 9(b) (of the Act) must be designed to preserve these rights." The next paragraph continues: "We will not . . . under the guise of accretion, compel a group of employees, who may constitute a separate appropriate unit, to be included in an overall unit without allowing those employees the opportunity of expressing their preference in a secret election or by some other evidence that they wish to authorize the union to represent them." 208 NLRB at 140 (Board quoting from Melbet Jewelry Co., Inc., 180 NLRB 107 (1969), at 109–110).

■ We think the employees in the present case as in *Pilot Freight Carriers* should have the opportunity to decide whether they want the union or not. The uncontradicted record shows that the two facilities, sixty miles apart, are as completely autonomous and self-sustaining insofar as management, personnel, administration, and supervision as any other branch or satellite within Westinghouse's Eastern Region, which stretches from Maine to North Carolina. There has been no employee interchange

at all, and the fact that the first seven Manassas servicemen were transferred from Laurel reflects nothing more than a common-sense decision in seeking to man the new operation with experienced employees, and with a minimum of expense and bother both to the transferred employees and to the company. There was no transfer of supervisory personnel from Laurel to Manassas, the lone supervisor there having been transferred from Akron, Ohio. Furthermore, after the Manassas operation got on its feet, there were no more transfers from Laurel; the last two servicemen hired at Manassas were not former Laurel employees.

There is nothing in the record to support an inference that the Laurel or Manassas facilities operated any differently than any other similar facility in the Westinghouse Consumer Service Division nationwide. Thus, the fact that the transferred servicemen were doing the same jobs with the same tools is of little or no consequence here, for it could show no more than that Westinghouse has attempted to standardize its service procedures at each of its facilities. The record shows that Virginia is under the control of the Eastern Regional Service Manager and is completely handled by an area manager at Richmond whose facilities include the satellites at Norfolk, Richmond, and Manassas. Also, the Manassas area of responsibility has increased substantially in the first thirteen months of its operation in area as well as in business, now covering all or parts of twice as many counties in Northern Virginia as were covered when Laurel handled the work. This growth of service area, coupled with the latest hirings of servicemen who were not from Laurel, and the complete removal of Laurel responsibility for Virginia service work, plainly shows that whatever similarities between the two facilities which existed at Manassas' inception have eroded, as Westinghouse planned when it accomplished the change. Additionally, we should add that, in the face of the demonstrated separateness of the Manassas facility (it is as separate as any satellite in the system), no reason has been shown why the Board should depart from the collective bargaining history which, without exception, has not had more than one facility in the same bargaining unit.

As stated before, *Pilot Freight Carriers* requires a consideration of the wishes of the employees involved. No such consideration was given here; indeed, the Board does not even mention the subject.

In the face of this, we think the Board should have viewed this case as it did *Pilot Freight Carriers*. The transferred employees at Manassas were given the choice whether to make the change or not; they elected to work at the Manassas facility under different supervision and a different wage and benefit system; and we think the Board's finding of an accretion to their former bargaining unit would wrongfully interfere with their right, along with the newly-hired servicemen at Manassas, to express their preference as to whether they want the union or not. If they desire a union, they may have one. As the Supreme Court has said, "[t]he Act is wholly neutral when it comes to that basic choice." NLRB v. Savair Manufacturing Co., 414 U.S. 270, 278, 94 S.Ct. 495, 499, 38 L.Ed.2d 495 (1973).

Order vacated and enforcement denied.