PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

THE BALTIMORE SUN COMPANY,
                    *Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,
                    *Respondent,*                     No. 00-1493

WASHINGTON-BALTIMORE NEWSPAPER
GUILD, LOCAL 32035, THE
NEWSPAPER GUILD-CWA,
                    *Respondent-Intervenor.*

NATIONAL LABOR RELATIONS BOARD,
                    *Petitioner,*

v.

THE BALTIMORE SUN COMPANY,
                    *Respondent,*                     No. 00-1774

WASHINGTON-BALTIMORE NEWSPAPER
GUILD, LOCAL 32035, THE
NEWSPAPER GUILD-CWA,
                    *Respondent-Intervenor.*

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board.
(5-CA-27814)

Argued: January 25, 2001

Decided: July 18, 2001

Before NIEMEYER and KING, Circuit Judges, and
Gerald Bruce LEE, United States District Judge for the
Eastern District of Virginia, sitting by designation.

---

Petition for review granted and cross-application for enforcement
denied by published opinion. Judge Niemeyer wrote the opinion, in
which Judge Lee joined. Judge King wrote an opinion concurring in
part and dissenting in part.

---

## COUNSEL

**ARGUED:** Jeremy Paul Sherman, SEYFARTH SHAW, Chicago,
Illinois, for Baltimore Sun. Steven B. Goldstein, NATIONAL
LABOR RELATIONS BOARD, Washington, D.C., for Board. Robert Edward Paul, ZWERDLING, PAUL, LEIBIG, KAHN, THOMPSON & WOLLY, P.C., Washington, D.C., for Intervenor. **ON
BRIEF:** Kristin E. Michaels, SEYFARTH SHAW, Chicago, Illinois,
for Baltimore Sun. Leonard R. Page, General Counsel, Aileen A.
Armstrong, Deputy Associate General Counsel, Julie B. Broido,
Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD,
Washington, D.C., for Board.

---

## OPINION

NIEMEYER, Circuit Judge:

This case presents the important question of when the National
Labor Relations Board may "accrete" employees to a collective bargaining unit by Board order in the absence of a representation election.

After the Baltimore Sun Company refused to bargain with the
Washington-Baltimore Newspaper Guild over the terms and conditions of employment for employees in the Company's "SunSpot"
website department — contending that the employees had been

improperly "accreted" to the bargaining unit — the National Labor Relations Board found that the Company committed an unfair labor practice and ordered it to bargain with the Union. The Company petitions for review of that order, and the Board, supported by the Union as intervenor, cross-petitions for enforcement of the order.

Because in this case the Board failed to follow its usually cautious standard for bypassing a representation election and accreting employees to a unit by Board order, we grant the Company's petition for review and deny the Board's cross-petition for enforcement. Our reasons follow.

I

The Baltimore Sun Company ("the Company") publishes and distributes a daily morning newspaper, *The Sun*, and a Sunday edition, *The Sunday Sun*, which are circulated in the area around Baltimore, Maryland. The Company also owns and operates several other businesses, including Alliance Media, a magazine publisher and distributor; Apartment Search, a service that introduces prospective tenants to prospective landlords; and SunDial, an interactive service that provides news, advertisements, and other information over the telephone. The Company operates from offices located throughout the Baltimore metropolitan area, but its primary office is located in downtown Baltimore.

For more than 50 years, the Washington-Baltimore Newspaper Guild (the "Union") has served as the collective bargaining representative for all of the non-managerial news and editorial employees of the Company. *See In re A. S. Abell Co.*, 81 N.L.R.B. 82 (1949). Also, employees in the mechanical and nonmechanical departments have elected to be included in the Union's bargaining unit, and the NLRB has included the Company's employees in the library and commercial departments. In addition, in 1990 the parties by agreement added employees in the SunDial department to the unit. Accordingly, the Union represents a bargaining unit consisting of a wide variety of positions within the Company's newspaper operations. While the efforts of these employees have focused historically on the production of *The Sun* and *The Sunday Sun*, the employees have also had responsibility for publishing other documents on a regular basis, such as a

report on Baltimore elementary schools, a business almanac, a gardening calendar, an outdoor guide, and educational materials. Other employees of the Company are represented by other unions, and still others are not represented by any union.

In June 1996, when the Company and the Union were completing negotiations for a new collective bargaining agreement, to take effect on June 23, 1996, they did not resolve whether employees developing a website for the Company would be in the bargaining unit represented by the Union. At the time, the Company was in the preliminary stages of developing the "SunSpot" website to provide, among other services, an Internet conduit for articles originally published in *The Sun*. When the Union sought information about the new SunSpot department, the Company's representatives stated that the website was "experimental" and that the "target" for making the website operational was "sometime this year." The Company also indicated that the new department's staff — which at the time consisted of a "content packager," a "website production manager," a "Web sales manager," and a secretary — might, within the near future, either expand or contract. The Union expressed its desire to represent the SunSpot employees, but the Company refused to agree. When the Company's representative stated during these negotiations that the Company's position was that SunSpot employees were not covered by the collective bargaining agreement, the Union representative responded, "I understand."

The parties did not resolve the issue at that time, and the final proposed collective bargaining agreement, which was provisionally ratified on June 22, 1996, did not address whether SunSpot employees were part of the bargaining unit covered by the agreement. Article I, section 1.1 of the agreement recognizes the Union as "the exclusive representative of the employees employed in job classifications covered by this Agreement." Section 1.2 states that the Union's jurisdiction "shall include new or additional work of a permanent nature in departments covered by this Agreement and requiring the same or similar skills for which bargaining unit employees are currently employed." Section 1.8 lists the three departments — editorial and news, commercial, and SunDial — covered by the agreement. In the news and editorial departments, the Union is assigned approximately 150 reporters, 50 copy editors, and several other editors, photogra-

phers, technicians, artists, writers, and clerks. The commercial department includes advertising salespersons, research analysts, janitors, carpenters, technicians, and various other personnel. But the SunSpot department employees were neither expressly included in, nor excluded from, the departments or job classifications outlined in the collective bargaining agreement.

Following ratification of the collective bargaining agreement, the Union and the Company continued negotiations over the status of the SunSpot department employees. The Union reiterated its belief that SunSpot employees should be included within the bargaining unit, and the Company's representatives continued to represent that the SunSpot website was not yet up and running, but in any event, the employees of the SunSpot department would not be within the Union's jurisdiction as outlined in the agreement.

In July 1996, the SunSpot website first became accessible on the Internet to a limited degree, and by the end of September it was fully and officially launched. The Company's newspapers now advertise SunSpot on the lower left-hand corner of each edition, providing its worldwide Web address — "The Sun on the Internet: http://www.sunspot.net" — and the site makes every *Sun* article accessible to Web surfers. In addition to providing links to *Sun* articles, obituaries, classifieds, and services, the site, at least as originally conceived, contained interactive games, an Internet soap opera, chat rooms, and permanent reference information about the Baltimore area.

The employees in the SunSpot department work in the Company's main office in downtown Baltimore, on the same floor as departments containing several bargaining unit employees. In addition to three supervisors — a sales manager, a Web community relations and content manager, and a Web production manager — the SunSpot department had at the time of contract negotiations four nonsupervisory employees. Tilthea Ransome, a confidential secretary, performs ordinary secretarial functions, but also tracks website usage, types the text of advertisements for the site, and archives *Sun* columns that appear on the site. Web producer Angie Van Hey ensures that the daily feed from the newspaper arrives properly, edits the articles for their entry on the webpage, decides which *Sun* photographs will appear on the

site, transfers the paper's columns to the site, and formats files and pictures for use on the site. Matthew Baize, the Web content producer, updates sections of the site, helps tailor Web content to certain advertisers, and designs the site's appearance. Finally, Brian Burns is a Web sales specialist who develops relationships with advertisers. SunSpot department employees meet separately to decide their own goals and budget, and they are provided a compensation package that differs from the package offered to members of the bargaining unit. In connection with the Union's organizing efforts, employees in the SunSpot department have apparently indicated that they do not wish to be represented by the Union.

Because the Company and the Union were unable to agree on whether the SunSpot department employees were part of the bargaining unit represented by the Union, the Union filed a petition with the Board on October 29, 1996, requesting that the bargaining unit be "clarified" by the Board to include SunSpot department employees without affording them an opportunity to make that decision through a representation election — a process that the Board's caselaw describes as "accretion." The Company opposed the petition, arguing (1) that it was untimely because it was filed after ratification of the collective bargaining agreement, and (2) that accretion of the SunSpot employees to the bargaining unit was improper because the SunSpot department employees could be a separate appropriate unit and did not possess the requisite "overwhelming community of interest" with the employees of the Union's bargaining unit to justify the inclusion of the SunSpot employees without the benefit of a representation election.

The NLRB's Regional Director granted the Union's petition. On the timeliness issue, the Regional Director reasoned that although "the Board generally declines to process a clarification petition during the term of an existing agreement which clearly defines the unit," the petition was timely because the Union never abandoned its position during negotiations that SunSpot department employees should be within the unit; the SunSpot department employees were not clearly excluded by the collective bargaining agreement; and the SunSpot website was not operational until after the collective bargaining agreement had been signed. On the merits, the Regional Director found that accretion was appropriate because the SunSpot department

employees "share an overwhelming community of interest with the represented employees and could not constitute a separate appropriate unit." In addressing the merits, the Regional Director did note that the hearing officer erred in excluding evidence of the SunSpot department employees' union sentiments, stating that it is the Board's position to permit consideration of "the desires of unrepresented employees in determining whether to accrete them to an existing unit." He concluded, however, that the error was not "prejudicial."

Without analysis, the Board denied the Company's request for review, explaining only that the Union's petition was timely because the SunSpot department "was not fully staffed and not fully operational until after the execution of a new contract." Member Hurtgen dissented in part, noting that while he agreed that the petition was timely, he would have reviewed the merits of the Regional Director's accretion decision.

To challenge the Board's accretion determination, the Company refused to bargain with the Union over the terms and conditions of employment of SunSpot department employees. When the Board's General Counsel subsequently filed an unfair labor practice complaint against the Company, the Board, noting that it had already resolved the Company's arguments in the clarification proceeding, entered summary judgment against the Company, declaring that the Company had committed an unfair labor practice, in violation of 29 U.S.C. §§ 158(a)(1) and (5). The Board thus ordered the Company to bargain with the Union over terms and conditions applicable to SunSpot department employees.

The Company thereupon petitioned this court for review, and the Board cross-petitioned for enforcement of its order. The Union has intervened to support the Board's cross-petition for enforcement.

II

Employee self-determination in the collective bargaining process is perhaps the most fundamental promise of the National Labor Relations Act (the "NLRA" or the "Act"), 29 U.S.C. § 151 *et seq.* Section 7 of the Act provides:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives *of their own choosing*, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities.

29 U.S.C. § 157 (emphasis added). This core provision guards with equal jealousy employees' selection of the union of their choice and their decision not to be represented at all. *See Newport News Shipbuilding & Drydock Co.*, 233 N.L.R.B. 1443, 1452 (1957). And the Act designates the Board as the primary guardian of the rights established by § 7. *See* 29 U.S.C. §§ 153, 159; *see also NLRB v. Lundy Packing Co.*, 68 F.3d 1577, 1579-80 (4th Cir. 1995).

Among the many functions assigned to the Board in furtherance of its role in protecting the self-determination of employees is the power to define "the unit appropriate for the purposes of collective bargaining." 29 U.S.C. § 159(b). Congress expressly directed the Board, when exercising this power, to do so with the purpose of "assur[ing] to employees the fullest freedom in exercising the rights guaranteed by this subchapter." *Id.* Accordingly, the Board's bargaining-unit determinations must necessarily accept, as a basic premise, the obligation to protect employees' § 7 rights. But in light of the NLRB's special expertise and its need for flexibility in crafting unique responses to the particular facts surrounding any given labor-management relationship, the Board generally enjoys broad discretion when it makes these determinations. *See Arcadian Shores, Inc. v. NLRB*, 580 F.2d 118, 119 (4th Cir. 1978). That discretion, while broad, is, of course, not unbridled, *see Westvaco, Va., Folding Box Div. v. NLRB*, 795 F.2d 1171, 1173 (4th Cir. 1986), for the size and scope of a bargaining unit can play a pivotal role in the employees' ability to exercise the rights conferred on them by § 7, *see Lundy Packing*, 68 F.3d at 1583 (noting that the "deference owed the Board" will not extend "to the point where the boundaries of the Act are plainly breached").

In defining an appropriate bargaining unit, the Board can exercise its power in two ways. The usual course is to delineate the boundaries

of a proposed unit in a clarification proceeding and then order an election in which the affected employees vote for or against union representation. *See*, *e.g.*, *Lundy Packing*, 68 F.3d at 1579. Alternatively and more rarely, the Board may, mainly for administrative convenience, "accrete" a small group of employees to a larger preexisting unit without the benefit of an election, thus assigning to the accreted employees the preexisting unit's choice of bargaining representative. *See Universal Security Instruments, Inc. v. NLRB*, 649 F.2d 247, 253 (4th Cir. 1981) (citing *Lammert Indus. v. NLRB*, 578 F.2d 1223, 1225 n.3 (7th Cir. 1978); *NLRB v. Sunset House*, 415 F.2d 545, 547 (9th Cir. 1969)). Because the accretion doctrine is in considerable tension with the statute's guarantee of employee self-determination, the Board has historically favored employee elections, reserving accretion orders for those rare cases in which it could conclude with great certainty, based on the circumstances, that the employees' rights of self-determination would not be thwarted.

Thus, the Board enters an accretion order only when the accreted employees have an insufficient group identity to function as a separate unit and their interests are so closely aligned with those of the preexisting bargaining unit that the Board can safely assume that the accreted employees would opt into that unit if given the opportunity. *See Archer Daniels Midland Co.*, 333 N.L.R.B. No. 81, 2001 WL 303760, at *6; *Safeway Stores, Inc.*, 256 N.L.R.B. 918, 918 (1981); *Melbert Jewelry Co.*, 180 N.L.R.B. 107, 110 (1969); *see also Westinghouse Elec. Corp. v. NLRB*, 506 F.2d 668, 672-73 (4th Cir. 1974) (noting that the Board may not, under the guise of accretion, deny employees an election to express their choice). While a mere finding of a "community of interest" among affected employees may be sufficient to justify the Board's action in defining a unit to conduct a representation election, *Lundy Packing*, 68 F.3d at 1581, a decision to accrete employees to a unit *without an election* requires a showing of much more. Accordingly, the Board has determined that it may issue an order to accrete employees to a preexisting bargaining unit only when the employees have "little or no separate group identity and thus cannot be considered to be a separate appropriate unit" *and* the community of interest between the employees and the existing unit is "overwhelming." *Safeway Stores*, 256 N.L.R.B. at 918; *see also Westvaco*, 795 F.2d at 1177-78 (applying with approval the *Safeway Stores* standard in the Fourth Circuit); *Universal Security*, 649 F.2d at 253

(same). The *Safeway Stores* rule is the standard announced by the Board that is applicable in this case.

III

The Company contends that the Regional Director, whose decision the Board affirmed without discussion of the merits, became confused by application of the appropriate standard and therefore "fail[ed] to explain why the SunSpot Department would not constitute a separate appropriate unit." In addition, it argues that the Regional Director's finding that SunSpot employees share an overwhelming community of interest with the bargaining unit "is not supported by the evidence."

Neither party challenges the propriety of applying the *Safeway Stores* standard for making accretion decisions, nor does any party argue that the rule is irrational or inconsistent with the NLRA. *See generally Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 364 (1998); *see also Westvaco*, 795 F.2d at 1177-78; *Universal Security*, 649 F.2d at 253-54. Rather, the question that the Company raises is whether, in this case, the Board properly applied the standard. This suggests the question, as phrased by the Supreme Court in an analogous context: Is the Board's "*announced* standard . . . *really* the effective one" in this case? *Allentown Mack*, 522 U.S. at 373. If not, any conclusion reached would violate the scheme of "reasoned decision-making" established by the Administrative Procedure Act, which requires "the Board . . . to apply in fact the clearly understood legal standards that it enunciates in principle." *Id.* at 376. Once the proper standard is understood, we must then determine whether the Board's conclusion under that standard was supported by substantial evidence. *See* 29 U.S.C. § 160(e). That standard is the same we apply when reviewing a jury verdict. *See Allentown Mack*, 522 U.S. at 366-67 (equating the "substantial evidence" inquiry with the question of "whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion").

The Board's announced standard for making accretion decisions has two defining prongs: (1) whether the subject employees "have little or no separate group identity and thus cannot be considered to be a separate appropriate unit," and (2) whether the subject employees "share an overwhelming community of interest" with the bargaining

unit to which they would be accreted. *Westvaco*, 795 F.2d at 1173 (quoting *Safeway Stores*, 256 N.L.R.B. at 918) (internal quotation marks omitted). Because the prongs are stated in the conjunctive, each provides an independent requirement. Thus, for example, a group of employees could be found to have no separate group identity and therefore could not be considered a separate appropriate unit. Yet, they might not have an overwhelming community of interest with the particular bargaining unit under consideration. Another bargaining unit might, in this hypothetical, be more appropriate. The *Safeway Stores* rule thus requires two separate findings. The first — whether the employees could be a separate appropriate unit — determines whether the employees should be allowed to exercise their choice through an election. The second — whether the employees, who could not be a separate unit, have an overwhelming community of interest with the bargaining unit under consideration — identifies whether the unit is one to which employees should be accreted or determines whether they should be accreted to any unit at all.

When the two-part test of *Safeway Stores* is faithfully applied, accretion of employees to a bargaining unit will occur only in those extraordinary cases in which the Board can be reasonably certain that no election is required and that the accreted employees share such similar interests with employees in the bargaining unit that they would choose it.\* *See* 256 N.L.R.B. at 918 (pointing out that "[t]he Board's fundamental concern, however, is to insure that in cases where such an issue [i.e., accretion] is raised the right of interested employees to determine their own bargaining representative will not

---

\*Given that the accretion doctrine is, at bottom, concerned with the protection of the accreted employees' wishes, we agree with the Regional Director that the hearing officer's exclusion of evidence proffered by the Company to show that SunSpot employees did not desire union representation was "error." *See Sandvik Rock Tools, Inc. v. NLRB*, 194 F.3d 531, 535 (4th Cir. 1999); *Westinghouse Elec.*, 506 F.2d at 673; *see also NLRB v. Stevens Ford, Inc.*, 773 F.2d 468, 474 (2d Cir. 1985); *NLRB v. Ideal Laundry & Dry Cleaning Co.*, 330 F.2d 712, 717 (10th Cir. 1964). But unlike the Regional Director, we fail to see how this error was not serious and prejudicial. Indeed, it is difficult to imagine more probative evidence of the employees' community of interest and group identity than documentation of their sentiment about the proposed accretion.

be thwarted"); *Melbert Jewelry*, 180 N.L.R.B. at 110 (stating that the Board will not "under the guise of accretion" deny employees "the opportunity of expressing their preference . . . that they wish to authorize the Union to represent them"). And because misuse of accretion poses a significant threat to the self-determination rights of employees guaranteed by § 7 of the NLRA, courts have been particularly vigilant in assuring that the Board observes in practice the strict standards it has adopted for accretion orders. *See*, *e.g.*, *Westvaco*, 795 F.2d at 1177; *NLRB v. Stevens Ford, Inc.*, 773 F.2d 468, 472-76 (2d Cir. 1985); *Westinghouse Elec.*, 506 F.2d at 672-73. If there is any substantial doubt, the policy of the NLRA requires that an election be conducted. *Cf. Martin Marietta Chems.*, 270 N.L.R.B. 821, 822 (1984) (noting that when "a question concerning representation [as between competing bargaining units] arises, . . . the Board will not impose a union by applying its accretion policy").

In this case, therefore, the Regional Director should have considered first the Board's jurisprudence for determining whether the Sun-Spot employees had a separate group identity sufficient to be considered a "separate appropriate unit." If the employees could be so considered, then accretion would be inappropriate.

When the Board determines whether employees could constitute an appropriate bargaining unit, it enjoys unusually broad discretion because bargaining units can be determined by reference to a long list of different factors, and there is very often "more than one appropriate bargaining unit within a single employment unit." *Sandvik Rock Tools, Inc. v. NLRB*, 194 F.3d 531, 534 (4th Cir. 1999). The Board is thus "free to select any one of those appropriate units as the bargaining unit." *Arcadian Shores*, 580 F.2d at 119. Twelve criteria, by which the Board determines whether a "community of interest" exists to support finding an appropriate bargaining unit, have been identified, and no one of them is more dominant than the other. *See Lundy Packing*, 68 F.3d at 1580. These are:

> (1) similarity in the scale and manner of determining the earnings; (2) similarity in employment benefits, hours of work, and other terms and conditions of employment; (3) similarity in the kind of work performed; (4) similarity in the qualifications, skills, and training of the employees; (5)

frequency of contact or interchange among the employees; (6) geographic proximity; (7) continuity or integration of production processes; (8) common supervision and determination of labor-relations policy; (9) relationship to the administrative organization of the employer; (10) history of collective bargaining; (11) desires of the affected employees; (12) extent of union organization.

*Id.* (quoting *I.T.O. Corp. v. NLRB*, 818 F.2d 1108, 1113 (4th Cir. 1987)) (internal quotation marks omitted); *accord Sandvik Rock Tools*, 194 F.3d at 535. When the Board applies these factors in a reasoned manner, its determination of an appropriate bargaining unit for an election stands unless it is shown to be "utterly inappropriate." *Arcadian Shores*, 580 F.2d at 120.

Because the Board's discretion in selecting an appropriate bargaining unit for an election is broad, that same breadth correspondingly narrows its discretion in accreting employees because, under the Board's accretion rule, any employees that could appropriately be a separate unit cannot be accreted to another unit.

In this case, the Regional Director seemed to overlook his obligation to determine first whether the SunSpot employees could be considered a separate appropriate unit. It appears that he instead focused on the second prong alone out of some demonstrated uncertainty about the appropriate rule. As he stated, "It is not entirely clear from Board precedent whether accretion is appropriate when the employees who would be added to the existing unit merely would not constitute a separate appropriate unit or whether they must also have an overwhelming community of interest with the represented employees." Had the Regional Director considered the first prong of the *Safeway Stores* rule, he would not have been able to conclude that the SunSpot department employees did not have a separate identity sufficient to be considered an appropriate bargaining unit.

The SunSpot department was organized as a separate department and effectively operated day to day as a separate department, even though it was geographically proximate to other departments. Its immediate supervisors were dedicated to the SunSpot department and did not overlap with any other department. *Cf. Sandvik Rock Tools*,

194 F.3d at 536. SunSpot employees did not participate in the preparation of the newspaper. The department's employees met as a department on a weekly basis; they decided their own goals in developing the website; they developed their own budget; and they controlled the terms and conditions of departmental work. They were also compensated differently from other employees, receiving a different benefit package and individually-negotiated wages. In focusing work on a website and on customers surfing the Web, the department's employees were required to have skills and expertise quite different from those employed in producing a newspaper. Moreover, the equipment and supplies they used did not overlap with any other department. Indeed, the only evidence of any sharing involved the isolated instance of using a projector from the newsroom and the occasional use of a copy machine in the advertising department. While SunSpot department employees interacted with other departments to obtain content for the website — e.g., news articles — and to solicit newspaper customers for advertising dollars, this degree of interaction is no different from that which is often found between separate appropriate units in any given business. The SunSpot department's employees did *not* overlap with other departments in other respects. For example, the unit employees did not participate in the production of the extensive material that appears exclusively on SunSpot, and none of the SunSpot employees who would fall within the NLRA's jurisdiction were hired from the newspaper operations. It is therefore not surprising that SunSpot department job classifications and descriptions differed from those in other departments.

Because these circumstances indicate that the SunSpot department could be a separate appropriate bargaining unit, *see Stephens Produce Co.*, 214 N.L.R.B. 131, 139 (1974) (finding that meat department employees constituted a separate appropriate unit from bakery and dairy employees), the first prong of the applicable rule precludes accretion of its employees to another unit. Just as we would be required to affirm a Board finding that the SunSpot department was a separate appropriate bargaining unit, we must reject accretion of the SunSpot department to another bargaining unit.

Even in his application of the second prong — whether the employees had an overwhelming community of interest with the bargaining unit — the Regional Director's conclusion is not supported

by substantial evidence. The Board was required to consider a broad range of factors to determine whether a group of employees shares an overwhelming community of interest with the bargaining unit, including "(1) similarity of working conditions; (2) job classification; (3) skills and functions; (4) similarity of products; (5) interchange ability of employees; (6) geographical proximity; (7) centralization of managerial control; (8) functional integration of the business; [and] (9) collective bargaining history." *Universal Security*, 649 F.2d at 253-54 (internal citations omitted). The Board need not apply these specific factors rigidly or formalistically, *see id.* at 254, because the factors merely serve as a convenient shorthand for the critical underlying question of whether the economic interests of the employees to be accreted are so closely aligned with those of the preexisting unit that the Board can safely assume that the employees would opt into *that* unit if given the opportunity. *See Safeway Stores*, 256 N.L.R.B. at 918.

Although the Regional Director analyzed each of these nine factors in this case, and the facts undoubtedly indicated that *some* community of interest exists between SunSpot employees and the bargaining unit, substantial evidence did not support the Regional Director's determination that this community of interest was so *overwhelming* that the employees' choice could be forgone.

In addition to all of the facts indicating that the SunSpot department acted separately and independently — as we recited above — most fundamental to the community-of-interest question is the fact that the SunSpot department employees were developing a product that, while obviously linked to and dependent upon the newspaper in important ways, was nonetheless a different product, aimed toward a different market and different customers, capable of generating profits for the Company in a very different manner. As the Union's president acknowledged, "The delivery of information via a website is different from the delivery of information via the printed newspaper." And because they were working to provide a fundamentally different product, SunSpot department employees possessed abilities that were similarly different from those possessed by bargaining unit employees. They were required to utilize technological and computer skills, such as programming in the HTML language, that unit employees were not required to have, and to perform tasks related to SunSpot's non-

newspaper-related services, such as moderating discussion groups and stockpiling permanent reference information. This inherent difference between the two sets of employees could not be overlooked. A reasonable jury could not have concluded that the community of interest with the bargaining unit was *overwhelming* such as to forecast that the SunSpot department employees would have wanted to join the bargaining unit. Even if this question were close, the Board should have resolved it by an election. *See Stevens Ford*, 773 F.2d at 473; *NLRB v. Food Employers Council, Inc.*, 399 F.2d 501, 505 n.1 (9th Cir. 1968); *Martin Marietta*, 270 N.L.R.B. at 822.

The Board's fundamental concern in its accretion cases, expressed through its announced rules of decision, has traditionally been "the right of interested employees to determine their own bargaining representative." *Safeway Stores*, 256 N.L.R.B. at 918. Accretion, according to these precedents, is an order of last resort, a drastic remedy for exceptional cases. Yet, the Board has not demonstrated why this case is so exceptional that an election should have been bypassed. The NLRA gives most workers "the opportunity to decide whether they want the union or not," *Westinghouse Elec.*, 506 F.2d at 672, and the employees of the SunSpot department should have that opportunity also.

When the Board applied only the second prong of its announced two-prong rule in this case, it breached the requirement of reasoned decisionmaking by "applying a rule . . . which is in fact different from the rule . . . formally announced." *Allentown Mack*, 522 U.S. at 374. Moreover, substantial evidence did not support a conclusion that either of the two prongs under the announced rule was met. We therefore grant the Company's petition for review and deny the Board's petition for enforcement of its bargaining order.

In light of our ruling on the merits, we need not address the Company's objection to the timeliness of the Union's clarification petition.

*PETITION FOR REVIEW GRANTED AND*
*ENFORCEMENT DENIED*

KING, Circuit Judge, concurring in part and dissenting in part:

As my good colleague Judge Niemeyer correctly emphasizes, the Regional Director appears in this case to have focused solely on the

"community of interest" inquiry, while neglecting to conduct the distinct, albeit related and required, analysis of whether the SunSpot employees could appropriately be considered a separate unit. Even if the SunSpot employees were properly found to share a community of interest with the employees in the Union's existing bargaining unit, accretion would nonetheless be improper if the SunSpot employees could be regarded as a separate unit. I agree with the panel majority that absent such a "separate unit" finding, the Regional Director's accretion analysis — adopted by the Board — is legally deficient.

I write separately, however, because I believe that, upon identifying the Regional Director's legal error, we should grant the Company's petition for review, deny the Board's cross-petition for enforcement, and remand so that the appropriate legal standard may be applied by the Board. Rather than remanding to the Board, however, the majority makes its own findings, surmising that the SunSpot department bears a separate identity sufficient to be considered an appropriate bargaining unit. *See ante* at 13-14 ("Had the Regional Director considered the first prong of the *Safeway Stores* rule, he would not have been able to conclude that the SunSpot department employees did not have a separate identity sufficient to be considered an appropriate bargaining unit."). Then, having determined that "the first prong of the applicable rule precludes accretion of [the SunSpot] employees to another unit," the majority proceeds to review the Board's application of the "community of interest" prong. *See ante* at 14-16. This sort of activism is inappropriate, and I believe that we should refrain both from reaching the merits of the first prong, i.e., whether the SunSpot employees actually constituted a separate unit, and from reviewing the Regional Director's application of the second prong, i.e., whether substantial evidence supported a finding that the SunSpot employees had an overwhelming community of interest with the existing bargaining unit.

Indeed, remand on the first *Safeway Stores* prong obviates any need to evaluate the second, "community of interest" prong at all. Such a course of avoidance seems particularly wise when we have substantial doubts concerning a core Board finding. After all, ascertaining whether employees share a community of interest — with each other or with employees in an existing bargaining unit — is an extremely fact-sensitive enterprise, with respect to which the Board

is entitled to great deference. Disturbing a decision peculiarly within the Board's expertise is a grave judicial exercise, and one that should be carried out with reluctance. The majority nevertheless opines that while "*some* community of interest exists between SunSpot employees and the bargaining unit," such community of interest is insufficient to justify the Board's accretion decision. *See ante* at 15 (emphasis in original). There is simply no reason, in this instance, to engage in that sort of line-drawing.*

Because I agree that the Board's decision was founded on the application of an improper legal rule, I would, as explained above, grant in part the Company's petition for review, and deny the Board's cross-petition for enforcement. Rather than conducting our own unwarranted evaluation of the merits, however, we should simply remand the case to the Board for reconsideration.

---

*Less conspicuously, the panel majority ascribes "serious and prejudicial error" to the hearing officer's exclusion of certain evidence sought to be introduced by the Company to show the SunSpot employees' aversion to union representation. *See ante* at 11 n.*. The majority neglects to mention that the proffered statements were made in the course of settlement discussions — and, as such, are of dubious admissibility. Rather, the majority registers its "agree[ment]" with the Regional Director that the exclusion of such evidence was "error," and cites cases supporting the proposition that employee sentiment is relevant to representation decisions.

Two additional points bear noting. While acknowledging that "the Board will consider the desires of unrepresented employees in determining whether to accrete them to the existing unit[,]" the Regional Director never explicitly concedes that exclusion of such evidence constituted error. *See* J.A. 33 n.13. He simply states that, "in view of the other evidence," the excluded statements "would not have been convincing in this case." *See id.* Moreover, the majority makes no attempt to refute the Regional Director's factual conclusion — as by demonstrating, for example, that the SunSpot employees had clearly manifested a will to remain outside the bargaining unit — but simply engages in speculation as to the gravity of the exclusion. *See ante* at 11 n.* ("Indeed, it is difficult to imagine more probative evidence of the employees' community of interest and group identity than documentation of their sentiment about the proposed accretion.").