PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SARA LEE BAKERY GROUP,
INCORPORATED, formerly known as
The Earthgrains Company,
*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,
*Respondent.*

No. 01-2067

NATIONAL LABOR RELATIONS BOARD,
*Petitioner,*

v.

SARA LEE BAKERY GROUP,
INCORPORATED, formerly known as
The Earthgrains Company,
*Respondent.*

No. 01-2228

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board.
(26-CA-18630, 26-CA-18717)

Argued: February 27, 2002

Decided: July 15, 2002

Before NIEMEYER and LUTTIG, Circuit Judges, and
Henry M. HERLONG, Jr., United States District Judge
for the District of South Carolina, sitting by designation.

Petition for review granted in part and denied in part and cross-application for enforcement granted in part and denied in part by published opinion. Judge Niemeyer wrote the opinion, in which Judge Herlong joined. Judge Luttig wrote an opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Charles Preyer Roberts, III, CONSTANGY, BROOKS & SMITH, L.L.C., Winston-Salem, North Carolina, for Sara Lee. David S. Habenstreit, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. **ON BRIEF:** Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Anne Marie Lofaso, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

---

## OPINION

NIEMEYER, Circuit Judge:

After The Earthgrains Company, Inc., a manufacturer of baked goods, acquired CooperSmith, Inc., another manufacturer of baked goods, and consolidated the facilities of the two companies in several cities, the National Labor Relations Board (the "Board" or the "NLRB") accreted CooperSmith's employees, who had not been represented by a union, into Earthgrains' existing bargaining units without giving the CooperSmith employees a chance to vote on whether they wished to be so represented. When Earthgrains refused to recognize the union at four of its Mississippi facilities — Meridian, Laurel, Hattiesburg, and Columbus — the Board found that Earthgrains committed unfair labor practices in violation of the National Labor Relations Act ("NLRA") and ordered Earthgrains to recognize the union at the four sites.

On Earthgrains' petition for review and the NLRB's cross-application for enforcement of its order, we conclude that at three of

the sites, the Board failed to apply its own precedents for accreting employees, and accordingly, with respect to those sites, we grant Earthgrains' petition for review and deny the Board's cross-application for enforcement. At the remaining site, we deny Earthgrains' petition for review and grant the Board's application for enforcement. Finally, with respect to a Board finding that Thomas Neal, an Earthgrains' employee, was constructively discharged for exercising statutory rights, we grant the Board's application to enforce as modified herein.

I

The Earthgrains Company, Inc. (now Sara Lee Bakery Group, Inc.) ("Earthgrains") manufacturers and distributes baked goods throughout the United States through distribution facilities, some of which also contain bakery stores. At many of these facilities, Earthgrains' employees have elected to be represented by the Bakery, Confectionary, and Tobacco Workers International Union (the "Union"). Before Earthgrains acquired CooperSmith, Inc., it had 19 distribution facilities in Mississippi, which were divided into three bargaining units, each of which had a collective bargaining agreement with Earthgrains.

On January 16, 1998, Earthgrains acquired CooperSmith, a competing distributor of baked goods, which also operated several facilities in Mississippi. None of CooperSmith's employees were represented by a union.

In cities where Earthgrains ended up with multiple facilities as a result of its acquisition of CooperSmith, Earthgrains consolidated the CooperSmith and Earthgrains facilities, closing either a former Earthgrains facility or a former CooperSmith facility and naming the new facility according to which company had the more dominant market share in the particular city. Earthgrains then associated union status with the name of the facility, continuing its recognition of the Union at facilities named Earthgrains and refusing to recognize the Union at facilities named CooperSmith.

In Meridian, Laurel, and Hattiesburg, Mississippi, Earthgrains closed its own former facilities and continued distribution using the

former CooperSmith facilities, transferring former Earthgrains employees to the new CooperSmith facilities to work there with the former CooperSmith employees.[1] After the consolidation, 11 of the 13 employees at Meridian were former CooperSmith employees; 8 of 9 employees at Laurel were former CooperSmith employees; and 10 of 15 employees at Hattiesburg were former CooperSmith employees. At Columbus, Earthgrains closed the CooperSmith facility and transferred the former CooperSmith employees to the Earthgrains facility. The consolidated facility had 4 former Earthgrains employees and 3 former CooperSmith employees. But because the Columbus market was dominated by the CooperSmith brand, Earthgrains renamed the former Earthgrains facility CooperSmith.

After Earthgrains declined to recognize the Union at the four facilities operating under the CooperSmith name, the NLRB's General Counsel charged Earthgrains with unfair labor practices in failing to negotiate with the Union, in violation of §§ 8(a)(1) and 8(a)(5) of the NLRA. In a split decision, the Board concluded that Earthgrains had violated the NLRA by refusing to negotiate with the Union and by making unilateral changes at these four facilities. In addition, the Board found that Earthgrains had constructively discharged Thomas Neal, an employee at Columbus, for exercising his rights under the NLRA, in violation of § 8(a)(3) of the Act.

In ruling that the newly-acquired CooperSmith facilities should have been included in preexisting Earthgrains bargaining units, the Board concluded that the acquisition "did not affect the appropriateness of the bargaining units or [Earthgrains'] obligation to recognize the Union as representative of those units, as enlarged by the accretion of CooperSmith employees." Chairman Peter Hurtgen dissented, concluding that the majority had failed to identify the issue properly. He stated that "the real issue is whether the newly acquired Cooper-Smith employees are appropriately a part of the two respective units. . . . The issue here is whether the new employees can be added to the unit without a vote." Addressing that issue, Chairman Hurtgen con-

---

[1]At Meridian, Earthgrains transferred only a portion of its employees to the new CooperSmith facility, retaining bakery workers at the former Earthgrains facility.

cluded that "accretion requires a finding of 'overwhelming community of interest,'" a finding which was not supported by the record.

From the Board's order, Earthgrains filed this petition for review, and the NLRB filed a cross-application for enforcement of its order.

## II

The principal question on appeal is whether the Board applied its long-standing principles for defining bargaining units and for accreting employees to existing bargaining units when it held that Earthgrains had an obligation to recognize bargaining units "as enlarged by the accretion of CooperSmith employees." In deciding such questions, the Board must apply its principles consistently. *See, e.g.*, *NLRB v. Lundy Packing Co.*, 68 F.3d 1577, 1583 (4th Cir. 1995).

At the outset, we agree with Chairman Hurtgen that the particular issue presented is whether the Board properly accreted the Cooper-Smith employees to Earthgrains' preexisting bargaining units — not whether Earthgrains' existing units remained "appropriate."[2] Because Earthgrains contends that it need not recognize union representation of the newly acquired CooperSmith employees, who had never been represented by a union or had the opportunity to vote for representation, the issue is whether accretion was justified and not whether the

---

[2]Our colleague in dissent likewise focuses on the appropriateness of Earthgrains' existing bargaining units, articulating the issue of whether former Earthgrains' employees "*must* be treated as separate bargaining units." (Emphasis added). Earthgrains, however, does not challenge the appropriateness of its existing bargaining units. Rather it raises the question of whether the Board could, in its discretion, recognize that the CooperSmith employees, at their respective facilities, might be constituted as separate units. If they could be so constituted, Earthgrains contends that the CooperSmith employees could not be accreted to the existing Earthgrains' units and thereby be denied the right to an election. Chairman Hurtgen likewise recognized the actual issue raised by Earthgrains, noting, "the real issue is whether the newly acquired Cooper-Smith employees are appropriately a part of the two [Earthgrains] units." He restated this issue as "whether the new employees can be added to the unit without a vote."

existing units remained appropriate. The transactional facts relating to this issue are not in dispute.

With respect to the CooperSmith employees at Meridian, Laurel, and Hattiesburg, the former CooperSmith facilities remained open, and the CooperSmith employees continued to work at those facilities. While Earthgrains transferred a few of its own former employees to each CooperSmith facility, the majority at each site remained former CooperSmith employees, and those employees had never elected to be represented by a union. With respect to the former CooperSmith employees at Columbus, they were transferred to a former Earthgrains facility where Earthgrains employees also worked. At that site, Earthgrains' employees, who were represented by the Union, remained in the majority.

In determining that the former CooperSmith employees at all four of these facilities should be accreted to two existing Earthgrains bargaining units, the Board stated simply:

> There is substantial record support for the [administrative law] judge's finding that [Earthgrains'] consolidation of its existing operations with [CooperSmith] *did not affect the appropriateness of the bargaining units* or [Earthgrains'] obligation to recognize the Union as representative of those units, *as enlarged by the accretion of CooperSmith employees*. Specifically, the record shows that: [Earthgrains] continues to produce and distribute bakery products without substantial changes in operations; employees from the historically represented units comprise a majority in each overall expanded unit; no other labor organization represented the CooperSmith employees; and those employees share a community of interests with the previously represented employees in the consolidated operations.

(Emphasis added). The Board did not address whether a community of interests existed between the employees of each of these separate facilities and the bargaining unit or whether the employees at each separate facility had a separate group identity sufficient to be considered a separate bargaining unit.

On appeal, Earthgrains argues that the Board "disregarded the appropriate decisional line, made no effort to explain why it had disregarded [its] precedent[s], and applied a completely inconsistent analysis that was patently inapplicable." It argues that the Board failed to take into account the fact that Earthgrains acquired new facilities in distinct geographical locations, thus overlooking its case law, which applies a presumption that a new facility has a separate group identity sufficient to be considered a separate bargaining unit.

The NLRB regulates in the broad policy context that "[e]mployee self-determination in the collective bargaining process is perhaps the [NLRA's] most fundamental promise." *Baltimore Sun Co. v. NLRB*, 257 F.3d 419, 426 (4th Cir. 2001). Specifically, § 7 of the NLRA grants employees the right to choose equally between self organization through representatives "of their own choosing" and the right "to refrain" from any collective bargaining activity. 29 U.S.C. § 157; *see also Melbet Jewelry Co.*, 180 N.L.R.B. 107, 109 (1969).

To protect the employees' right of self-determination, the Board is given broad discretion to define appropriate collective bargaining units. *See* 29 U.S.C. § 159(b); *Lundy Packing*, 68 F.3d at 1579-80. Those units, in turn, vote on union representation, and, if the union wins, the union may bargain collectively with the employer to reach a collective bargaining agreement that will govern the unit for an agreed term. During the term of the collective bargaining agreement, new employees of the company where the bargaining unit exists are routinely accreted into the unit to be bound by the agreement. *See, e.g.*, *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 786 (1996) (describing the union's entitlement to a presumption of majority status during the term of a collective bargaining agreement). But that routine course of action assumes that the new employees have "little or no separate group identity and thus cannot be considered to be a separate appropriate unit." *Baltimore Sun*, 257 F.3d at 427 (citation and internal quotation marks omitted).

In contrast, when an entire group of nonunion employees joins a union company, accretion is rare and is reserved only for "cases in which [the Board] could conclude with great certainty, based on the circumstances, that the employees' rights of self-determination would not be thwarted." *Baltimore Sun*, 257 F.3d at 427. Specifically,

through its announced standard, the Board rejects accretion unless two prerequisites have been satisfied: (1) the Board must find that the new employees have "an insufficient group identity to function as a separate unit"; and (2) it must find an "overwhelming community of interest," such that the accreted employees have "interests [that] are so closely aligned with those of the preexisting bargaining unit that the Board can safely assume that the accreted employees would opt into the unit if given the opportunity." *Baltimore Sun*, 257 F.3d at 427 (citing *Safeway Stores*, 256 N.L.R.B. 918, 918 (1981)).

When a company acquires new employees through the acquisition of an entire facility, the Board has presumptively treated the employees at the new facility as a separate bargaining unit. *See, e.g.*, *ATS Acquisition Corp.*, 321 N.L.R.B. 712, 712 (1996); *Gitano Groups, Inc.*, 308 N.L.R.B. 1172, 1175 (1992). And the Board generally does not compel the employees at the new facility to be included in a preexisting bargaining unit "without allowing those employees the opportunity of expressing their preference in a secret election." *Archer Daniels Midland Co.*, 333 N.L.R.B. No. 81, 2001 WL 303760, at *6 (2001) (quoting *Melbet Jewelry*, 180 N.L.R.B. at 110); *Kroger Co.*, 155 N.L.R.B. 546, 548-49 (1965) (requiring new elections when two plants "merge into an entirely new operation"); *General Extrusion Co.*, 121 N.L.R.B. 1165 (1958) (refusing to apply the contract bar doctrine where "changes have occurred in the nature as distinguished from the size of the operations . . . involving . . . a merger of two or more operations"). But even if the Board fails to apply this presumption, it will bypass elections and accrete the employees at the separate facility into the existing bargaining unit only when it is clear that a majority of the employees at the new facility acquired by the company wishes to join the existing bargaining unit — i.e., only where the Board "could conclude with great certainty . . . that the employees' rights of self-determination would not be thwarted." *Baltimore Sun*, 257 F.3d at 427.

At the three locations where Earthgrains acquired new facilities and where it continued with CooperSmith employees — Meridian, Laurel, and Hattiesburg — the Board failed to apply its presumption that each new facility be regarded as a separate bargaining unit. *See ATS Acquisition*, 321 N.L.R.B. at 712; *Gitano Group*, 308 N.L.R.B.

at 1175. For this reason alone, we decline to enforce the Board's order accreting the employees at those facilities.

But even without the presumption from *ATS Acquisition* and *Gitano Group*, the Board failed to apply its long-standing principles for accreting groups of new employees into existing bargaining units. It did not, and could not, conclude that the employees at each Cooper-Smith facility had an "insufficient group identity to function as a separate unit," *Baltimore Sun*, 257 F.3d at 427, and that the community of interest between those employees and the employees in the existing Earthgrains bargaining unit was "overwhelming," *Safeway Stores*, 256 N.L.R.B. at 918. To reach such a conclusion, the Board would have had to find that the former CooperSmith employees, at each historically nonunionized facility in a location geographically distinct from employees in the Earthgrains bargaining unit, could not have a group identity sufficient to form a bargaining unit. *See Arcadian Shores, Inc. v. NLRB*, 580 F.2d 118, 120 (4th Cir. 1978). Given its broad discretion to define bargaining units, the Board could not have overcome that barrier. And without satisfying itself that the employees at each separate facility could not have a group identity, the Board could not have accreted the CooperSmith employees to an existing bargaining unit.

Moreover, the Board could not have satisfied the second step of its *Safeway Stores* accretion standard — that the CooperSmith employees had an "overwhelming" community of interest with the Earthgrains employees in the bargaining units. To decide that question, the Board traditionally applies a 12-factor test, considering:

> (1) similarity in the scale and manner of determining the earnings; (2) similarity in employment benefits, hours of work, and other terms and conditions of employment; (3) similarity in the kind of work performed; (4) similarity in the qualifications, skills, and training of the employees; (5) frequency of contact or interchange among the employees; (6) geographic proximity; (7) continuity or integration of production processes; (8) common supervision and determination of labor-relations policy; (9) relationship to the administrative organization of the employer; (10) history of

collective bargaining; (11) desires of the affected employees; (12) extent of union organization.

*Lundy Packing*, 680 F.3d at 1580. The Board did not conduct this analysis. And if it had conducted the analysis, even the limited record in this case demonstrates the Board could not have overcome this second step.

Notwithstanding the similarity between CooperSmith's and Earthgrains' operations, the CooperSmith employees worked at separate facilities in geographical locations distinct from the areas in which employees in Earthgrains' bargaining units worked. In addition, CooperSmith employees worked under conditions that developed over years of working for CooperSmith before it was acquired by Earthgrains. And the employees at the CooperSmith facilities had never been unionized or subject to a collective bargaining agreement. Finally, even after a few Earthgrains employees were transferred to each of the former CooperSmith facilities, the CooperSmith employees continued to outnumber the Earthgrains employees by substantial margins — 11 to 2 at Meridian; 8 to 1 at Laurel; and 10 to 5 at Hattiesburg. These data alone suggest that the former CooperSmith employees might successfully assert their historically separate interests through a vote, if given the chance. Certainly, the Board could not "safely assume that the accreted [CooperSmith] employees would opt into [the relevant Earthgrains] unit if given the opportunity." *Baltimore Sun*, 257 F.3d at 427. As we observed in *Baltimore Sun*:

> Because the accretion doctrine is in considerable tension with the statute's guarantee of employee self-determination, the Board has historically favored employee elections, reserving accretion orders for those rare cases in which it could conclude with great certainty, based on the circumstances, that the employees' rights of self-determination would not be thwarted.

*Id.*

Accordingly, we conclude that the Board, in accreting the CooperSmith employees at the Meridian, Laurel, and Hattiesburg facilities into two Earthgrains bargaining units, failed to follow its own stan-

dards for doing so. Therefore, we decline to enforce the Board's order directing Earthgrains to recognize that those employees are represented by the Union.

At the Columbus facility, however, the circumstances are sufficiently different to justify a different result. Even after its acquisition of CooperSmith, Earthgrains continued the operation of its own former facility in Columbus, even though it changed the name of that facility to CooperSmith, and it transferred the former CooperSmith employees to the former Earthgrains facility. Also, after the Cooper-Smith employees were transferred to the former Earthgrains facility, the Earthgrains employees continued to outnumber the CooperSmith employees, four to three. Because the former CooperSmith employees were moved into the Earthgrains facility and worked there under the conditions historically established through a collective bargaining agreement, the presumption of *ATS Acquisition* and *Gitano Group* would not apply. Moreover, when we apply the traditional standards for accreting employees, the outcome becomes a much closer question, and we cannot conclude that the Board violated its own standards. Accordingly, we will grant the Board's cross-application to enforce its order insofar as it applies to the Columbus facility.[3]

## III

Earthgrains also challenges the Board's finding that Earthgrains violated § 8(a)(3) of the NLRA by "constructively discharging" Thomas Neal for exercising his statutory rights.

Neal was hired in November 1996 as a route salesman at Earthgrains' Columbus facility. A few months later, in February 1997, his

---

[3]We reject Earthgrains' additional argument for refusing to recognize the Union at Columbus. Earthgrains argues that because the local union was placed in trusteeship by reason of financial deficiencies and defalcations, it was unable to represent Earthgrains' employees adequately. But we can find nothing in the record to suggest that the interests of the employees were ever compromised. To the contrary, since September 1998, when the trusteeship began, the trustee has continued to meet and negotiate with Earthgrains to the extent that Earthgrains was willing to bargain.

route was eliminated, and Neal was laid off. Shortly thereafter, however, Neal was recalled as a depot loader. He was told upon his return that he could return to his route salesman position if a route came open.

Following Earthgrains' acquisition of CooperSmith in January 1998, sales routes were restructured and reassigned. When Neal was not given one of the routes, he filed a grievance through the Union, which was rejected. Subsequently, when a route salesman was fired and another route came open, Neal requested that route. He was told, however, that he would get the route only if Willie Williams, another employee, turned it down. When Neal asked why Williams had priority for the position, Neal claims that he was told by David Willis, his supervisor, "If I had kept my nose — if I'd keep my nose clean and leave the union mess alone, I could get a route." Neal was left with the belief that he "would have got a route" but for his union participation.

Neal nevertheless continued to work as a depot loader for approximately another month and a half. He then resigned, giving the following explanation for his resignation:

> I had heard that they were going to try to do away with my job regardless, because they was going to try to work where there wouldn't be a depot loader, and I figured I better get out of there before they laid me off, so I turned in a week's notice the first part of June and worked it out.

Neal's fear of losing his job was based on an informal conversation with a Meridian supervisor about rumors from which Neal drew inferences. But Neal was never told by the company, or even formally by *anyone*, that his job would be eliminated. Nor was he told that, in the event of the elimination of his job, he would lose his job rather than being transferred to a new position. And as it turned out, the rumors on which Neal acted were inaccurate. Neal's depot loader position was never eliminated.

We conclude that substantial evidence supports the Board's finding that Earthgrains, by refusing to promote Neal to route sales representative, violated § 8(a)(3) of the NLRA. Neal's testimony, which was

not rebutted, supports the Board's conclusion that Neal was not given the route salesman position because of his union participation. Accordingly, we affirm the Board's finding that an illegal animus contributed to Earthgrains' decision to deny Neal a position as route sales representative.

But on the Board's finding that Earthgrains violated § 8(a)(3) by "constructively discharging" Neal from his job as depot loader, we conclude that the Board had no substantial evidence to support its finding.

To prove constructive discharge, the General Counsel would have to establish "that the employer [intentionally] made the employee's working conditions intolerable" and "that the employer did so because of the employee's union activities." *NLRB v. Grand Canyon Mining Co.*, 116 F.3d 1039, 1049 (4th Cir. 1997). The Board has held that constructive discharge may also be proved with evidence that the employee faced a "Hobson's Choice" between continued employment and "abandon[ing] his or her [statutory] rights." *Intercon I (Zercom)*, 333 N.L.R.B. No. 30, 2001 WL 408748 *1 (2001).

In this case the Board found that Neal "quit after being confronted with a [Hobson's] choice between resignation or continued employment conditioned on relinquishment of statutory rights." The evidence in the record, however, does not support this conclusion.[4] Despite the suggestion to Neal that he would be promoted to route salesman only if he "would leave the union alone," there was never any suggestion that Neal's continued employment *as a depot loader* was conditioned on relinquishment of his statutory rights. No one from Earthgrains management ever threatened Neal with discharge or intimated that Neal's job as a depot loader was in danger because of his union activities. To the contrary, Neal's own testimony supports only the conclusion that he resigned because of rumors that his job would be eliminated due to some further restructuring. He has made no suggestion that the rumors about the elimination of his job were in any way

---

[4]Because we conclude that the record evidence does not support a finding that Neal faced an unlawful "Hobson's Choice," we need not reach the issue, raised by Earthgrains, of whether the Board's "Hobson's Choice" precedent is consistent with the NLRA.

directed at him or, indeed, that the rumors were even circulated by management. In short, there is simply no basis for finding that Neal faced a Hobson's Choice of quitting his depot loader job or relinquishing his statutory rights.

Thus, while we refuse to enforce any remedy based on a finding that Neal was constructively discharged, we conclude that Neal nevertheless is entitled to a remedy by reason of Earthgrains' refusal to promote him to the route salesman position. Accordingly, we will grant the Board's application to enforce its order insofar as it requires Earthgrains to offer Neal the position of route salesman or a "substantially equivalent position" if that position no longer exists. Any backpay remedy would accordingly pay Neal the difference between what he would have made as a route sales representative and what he actually made as a depot loader and at whatever jobs he held after his resignation, covering a period commencing with the date he was first denied a route and ending with the date of offer of reinstatement. Finally, the "Notice to Employees" provided for in the Board's order would have to be modified to read: "We will offer immediate and full reinstatement to Thomas Neal to a route sales representative job, and we will make Neal whole for all losses because of our unlawful refusal to grant his request for a route sales representative job."

IV

In sum, we grant Earthgrains' petition for review insofar as it relates to the Board's accretion of former CooperSmith employees at Meridian, Laurel, and Hattiesburg. We also grant its petition insofar as it challenges the Board's finding that Earthgrains constructively discharged Neal. In all other respects, we deny Earthgrains' petition. Correspondingly, we grant the Board's cross-application for enforcement of its order as it applies at Columbus, and we grant its cross-application for enforcement of its order with respect to Earthgrains's denial of Neal's promotion to a route sales representative. In all other respects, we deny enforcement of the Board's order.

*IT IS SO ORDERED*

LUTTIG, Circuit Judge, concurring in part and dissenting in part:

The majority concludes that the Board failed to properly apply its precedents regarding whether a company's employees at a "new facil-

ity" must be regarded as a separate bargaining unit, and, "for this reason alone," it denies enforcement to the Board's finding that Earthgrains committed an unfair labor practice by refusing to recognize the union at the consolidated facilities in Meridian, Laurel, and Hattiesburg. *See ante* at 8. I believe that this conclusion is based on a misreading of the Board's previous decisions and a misunderstanding of this court's authority to review decisions of the Board. Futhermore, I cannot agree with the majority's holding that the Board "could not" have concluded that the former CooperSmith employees at these three consolidated facilities satisfied the Board's standard announced in *Safeway Stores*, 256 N.L.R.B. 918 (1981), for accretion into union-represented bargaining units. The majority's analysis blurs together and confuses two distinct issues presented in this case: first, whether the former *Earthgrains* employees in the consolidated units must be treated as separate bargaining units, apart from the unionized multi-facility bargaining units that had been established pre-consolidation, and second, whether the former *CooperSmith* employees in those consolidated facilities may be accreted to those bargaining units. For these reasons, I dissent from Part II of the majority's opinion, and would enforce the portion of the Board's order requiring Earthgrains to recognize the union at all four of the consolidated facilities.

## I.

The majority does not accurately describe the bargaining units and labor situation at Earthgrains. Before its acquisition of CooperSmith, Earthgrains was a party to four different collective bargaining agreements with the Bakery, Confectionary, and Tobacco Workers International Union, Local 149 ("the Union"), each covering a separate "bargaining unit" of Earthgrains employees. One of these collective bargaining agreements covered all production employees at Earthgrains' bakery in Meridian, Mississippi. The other three agreements covered delivery and sales employees, who worked among Earthgrains' nineteen different distribution facilities throughout the state. These three agreements were known as the "Meridian agreement," the "Gulfport agreement," and "Jackson agreement."[1]

---

[1]The Meridian bargaining unit comprised sales employees in: Meridian (7), Columbus (5), Tupelo (4), Forest (5), Greenville (2), Kosciusko (5),

After the acquisition of CooperSmith, a non-union competitor,[2] Earthgrains consolidated operations in each city that had both an Earthgrains and CooperSmith distribution facility. One facility would be closed, and the remaining facility was viewed as either an "Earthgrains" or a "CooperSmith" operation, depending on which company had been dominant pre-consolidation in the relevant geographic area. Four of the consolidated facilities, located in Meridian, Laurel, Hattiesburg, and Columbus, were deemed continuing CooperSmith operations, because CooperSmith had the dominant market share in those localities.[3] In Meridian, Laurel, and Hattiesburg, the former Earthgrains facility was physically closed and the CooperSmith facility was used. In Columbus, the old Earthgrains facility was used and the CooperSmith facility closed. These consolidated facilities employed both former CooperSmith (non-union) employees and former Earthgrains (union) employees.[4]

---

Vicksburg (1), Philadelphia (5), Grenada (2), Jackson (12), Magee (2), and Yazoo City (1). The Gulfport bargaining unit covered workers in: Laurel (4), Hattiesburg (6), Brookhaven (2), Picayune (1), Lucedale (1), Gulfport (11), and Pascagoula (5). Finally, the Jackson bargaining unit covered a portion of the sales employees in Jackson, who previously worked for Hardins Bakery. When Earthgrains acquired Hardins Bakery in 1986, the former Hardins Bakery workers continued working for Earthgrains under their extant collective bargaining agreement (now known as the "Jackson agreement"), which Earthgrains assumed, while Earthgrains' other employees at the Jackson facility were covered by the "Meridian agreement."

[2]All of CooperSmith's employees, at the time of acquisition, were non-union. J.A. 714.

[3]The other three consolidated facilities (in Jackson, Philadelphia, and Forest) were viewed as continuing Earthgrains operations, because Earthgrains had been dominant in those geographic regions. Earthgrains continued to apply the existing collective bargaining agreements to the workers in those facilities, including the former CooperSmith employees who transferred in.

[4]Of the Meridian facility's thirteen consolidated sales and delivery employees, eleven were former CooperSmith employees and two were from Earthgrains. In Laurel, eight came from CooperSmith and one from Earthgrains. In Hattiesburg, ten previously worked for CooperSmith and five for Earthgrains. In Columbus, three were from CooperSmith and four from Earthgrains.

Earthgrains did not recognize the union of the former Earthgrains employees at the consolidated facilities in Meridian, Laurel, Hattiesburg, and Columbus, *even though these employees, while they worked in the former Earthgrains facility, had been covered by either the Meridian or Gulfport collective bargaining agreement.*[5] The National Labor Relations Board found this to be an unfair labor practice, ruling that all of the employees at the consolidated facilities in Meridian and Columbus were included in the Meridian collective bargaining agreement, and that the Laurel and Hattiesburg employees were covered by the Gulfport agreement. J.A. 478; 485.

## II.

The Board rejected Earthgrains' argument that the workers at the consolidated facilities in Meridian, Laurel, and Hattiesburg should be regarded as separate bargaining units, outside the scope of the Meridian and Gulfport collective bargaining agreements, holding that Earthgrains bore the burden of proving that the consolidation with CooperSmith altered the existing bargaining units to the point that they were no longer appropriate, and that Earthgrains failed to show that the consolidation had affected the appropriateness of the existing bargaining units.[6] J.A. 478; 485. Nowhere does the majority claim that the Board's refusal to regard the consolidated facilities at Meridian, Laurel, and Hattiesburg as separate bargaining units is contrary to, or an unreasonable interpretation of, the National Labor Relations Act. Rather, the only apparent basis for the majority's decision to deny enforcement to this portion of the Board's order is that the Board violated the Administrative Procedure Act by failing "to apply

---

[5]Earthgrains' workers in the Meridian and Columbus facilities had been covered by the Meridian agreement; Earthgrains' workers in the Laurel and Hattiesburg facilities had been covered by the Gulfport agreement.

[6]The Board specifically relied on the findings in the record that Earthgrains "continues to produce and distribute bakery products without substantial changes in operations; employees from the historically represented units comprise a majority in each overall expanded unit; no other labor organizations represented the CooperSmith employees; and those employees share a community of interests with the previously represented employees in the consolidated operations." J.A. 478.

in fact the clearly understood legal standards that it enunciates in principle." *Allentown Mack* v. *NLRB*, 522 U.S. 359, 376 (1998). The majority characterizes the Board's decisions in *ATS Acquisition*, 321 N.L.R.B. 712 (1996), and *Gitano Groups, Inc.*, 308 N.L.R.B. 1172 (1992), as establishing a "presumption" that "employees at [a] new facility" are treated as a separate bargaining unit.

Those cases hold no such thing, and the Board has not violated principles of reasoned decisionmaking by arbitrarily declining to apply its previously-announced standards. In *Gitano*, the Board held that when an employer "transfers *a portion of its employees at one location* to a new location," the unit at the new facility is presumptively a separate unit. *Id.* at 1175 (emphasis added). If that presumption is not rebutted, a majority test determines whether the employer must recognize the union at the new facility. *See id.* at 1175 ("If a majority of the employees in the unit at the new facility are transferees from the original bargaining unit, we will presume that those employees continue to support the union and find that the employer is obligated to recognize and bargain with the union . . ."). The majority appears to believe (although it does not explain why) that the *Gitano* presumption should apply because the union employees in Meridian, Laurel, and Hattiesburg were physically relocated to the established CooperSmith facilities. When Earthgrains consolidated operations in Meridian, Laurel, and Hattiesburg, however, it did not "transfer a *portion* of its employees *at one location* to a new location," rather, it relocated and consolidated an entire facility, transferring *all* (not a portion) of its remaining employees at that old facility to the new location. Although the transferred employees were a "portion" of their overall bargaining unit (the Gulfport bargaining unit for the Laurel and Hattiesburg employees, and the Meridian bargaining unit for the workers in Meridian), they did not constitute a "portion" of Earthgrains' employees *at their original locations* in Meridian, Laurel, or Hattiesburg, as required for the *Gitano* presumption to apply.

In *Gitano*, as well as in the Board cases relied upon by Earthgrains in which the Board applied the *Gitano* presumption, a portion of unionized employees remained at the original facility while another portion were transferred to a new location. *See U.S. Tsubaki*, 331 NLRB No. 47 (2000); *ATS Acquisition Corp., Inc.*, 321 NLRB 712

(1996); *Ryder Truck Rental, Inc.*, 318 NLRB 1092; *Armco Steel Co.*, 312 NLRB 257 (1993). The Board has never applied the *Gitano* presumption when an entire facility is relocated or consolidated, and the language of *Gitano* does not require such a result. Accordingly, it was permissible for the Board to hold that the employees at the consolidated facilities who were transferred from former Earthgrains facilities remained part of the established bargaining units and retained their rights to union representation.

Oddly enough, the majority's opinion, while faulting the Board for failing to presume that *all* the employees at the consolidated facilities, whether former Earthgrains or former CooperSmith employees, are separate from the existing Earthgrains bargaining units, only denies union representation to the former *CooperSmith* employees at those facilities. *See ante* at 10-11 ("[W]e conclude that the Board, in accreting the *CooperSmith employees* at the Meridian, Laurel, and Hattiesburg facilities into two Earthgrains bargaining units, failed to follow its own standards for doing so. Therefore, we decline to enforce the Board's order directing Earthgrains to recognize that *those employees* are represented by the Union." (emphasis added)). The majority opinion apparently leaves intact the Board's order requiring Earthgrains to recognize the union as the representative of the former *Earthgrains* employees at the three consolidated units. No election has been held among these employees, however, so the only basis for continued union representation is if these employees are somehow still part of the existing, multi-facility, union-represented Earthgrains bargaining units. But such would be inconsistent with the majority's insistence that the Board should have applied *Gitano*'s presumption of *separate* bargaining units. Perhaps the majority assumes that the union successfully rebutted the *Gitano* presumption with respect to these former Earthgrains employees at the consolidated facilities, but there certainly is no discussion of this. And it would be most inappropriate for the majority to make such a tacit assumption without citing to any evidence in the record and without giving Earthgrains an opportunity to show, on remand to the Board, that the *Gitano* presumption has not been rebutted. So it appears that the outcome reached by the majority, which allows the former Earthgrains employees in the consolidated facilities to retain their union representation, is irreconcilable with its discussion of *Gitano* (but consistent with my view about the scope of *Gitano*, which, for the reasons I discussed above, does not apply to

this case). I have no quarrel with the majority's ultimate conclusion that the union still represents the employees who were transferred from the former Earthgrains facilities in Meridian, Laurel, and Hattiesburg, but I cannot understand its rationale.

### III.

As to the former *CooperSmith* employees now working in the consolidated facilities, the issue is whether they can properly be accreted to the bargaining units consisting of unionized Earthgrains employees. Board precedent permits employees to be accreted to a preexisting bargaining unit when the employees have "little or no separate group identity and thus cannot be considered to be a separate appropriate unit" and the community of interest between the employees and the existing unit is "overwhelming." *Safeway Stores*, 256 NLRB at 918. *See also Staten Island University Hospital* v. *National Labor Relations Board*, 24 F.3d 450, 455 (2d Cir. 1994) ("Accretion requires an overwhelming community of interests between a smaller group of employees and a larger unit . . . [and] applies only if one group of employees has no identity distinct from the other.").

In making its finding of accretion, the Board stated, in conclusory fashion, that the consolidated CooperSmith employees "share a community of interests" with the unionized Earthgrains employees. J.A. 478. As the majority notes, the Board did not address whether this community of interests was "overwhelming," nor did it discuss the "little or no separate group identity" requirement of the *Safeway Stores* test. Although I agree with the majority that the Board should have more carefully applied its announced accretion standards to the facts of this case, rather than glossing over the accretion issue as it did,[7] I do not think it appropriate to deny enforcement of this part of

---

[7]This is especially true in light of our court's observation that "courts have been particularly vigilant in assuring that the Board observes in practice the strict standards it has adopted for accretion orders." *Baltimore Sun Co.* v. *NLRB*, 257 F.3d 419, 430 (4th Cir. 2001) (refusing to enforce an accretion order by the Board when it failed to consider the "little or no separate group identity" prong of the *Safeway Stores* standard). *See also Universal Security Investments, Inc.* v. *National Labor Relations Board*, 649 F.2d 247, 253 (4th Cir. 1981) ("In making its

order because the record in this case contains substantial evidence that would have allowed the Board to find that the accreted CooperSmith employees have "little or no separate group identity" from, as well as an "overwhelming community of interest" with, the unionized Earthgrains employees.

The majority gives four reasons to support its conclusion that the Board's accretion order fails the *Safeway Stores* test. None is persuasive and only one is even relevant. The majority is mistaken to rely on the *pre-consolidation* attributes of the former CooperSmith employees, such as their distinct geographical employment locations and unique working conditions. These have no bearing on whether the proper subjects of the accretion inquiry — whether, *post-consolidation*, these employees have "little or no separate group identity" from, as well as an "overwhelming community of interest" with, the unionized Earthgrains employees. The majority's desire to ignore the post-consolidation characteristics of the former CooperSmith employees is understandable, because none of them could possibly support its refusal to enforce the Board's accretion order. The record reveals that the former CooperSmith employees are in no way cordoned off from the unionized Earthgrains employees; quite the contrary, they are working side by side, in the same facilities, performing the same tasks in delivering baked goods.

The majority also makes much of the fact that former CooperSmith employees outnumber the unionized Earthgrains employees at the three consolidated facilities in dispute, and claims that "[t]hese data alone suggest that the former CooperSmith employees might successfully assert their historically separate interests through a vote, if given the chance." *Ante* at 10. The Board's order, however, accretes the former CooperSmith employees to bargaining units that encompass *multiple* Earthgrains facilities, and the former CooperSmith employees do

---

[accretion] determination the Board *must closely analyze* whether the new and old employees truly share a 'community of interest.'") (emphasis added). Because accretion forecloses the accreted employees' basic right to select their bargaining representative, the Board should not lightly impose a union on employees who have never indicated a preference for such representation.

not constitute such a sizable portion of the Meridian or Gulfport bargaining units as to cast doubt on the union's majority status among the accreted units. Moreover, the high ratio of former CooperSmith employees to unionized Earthgrains employees does not, without further analysis, have any direct relevance to the two prongs of the *Safeway Stores* test. Large numbers of non-union employees may nevertheless have "little or no separate group identity" from, as well as an "overwhelming community of interest" with, a small number of unionized employees.

The majority does point to one relevant factor that bears on whether the "overwhelming community of interest" prong has been satisfied, and that is the lack of prior union representation among the accreted CooperSmith employees. *See National Labor Relations Board* v. *Lundy Packing*, 68 F.3d 1577, 1580 (4th Cir. 1995) (listing the "history of collective bargaining," "desires of the affected employees" and "extent of union organization" among the twelve factors the Board has traditionally applied when applying the "community of interest" test). However, many other factors traditionally considered by the Board in making "community of interest" determinations cut in the opposite direction and support the Board's finding of accretion, especially such factors as the "similarity in the kind of work performed," "similarity in the qualifications, skills, and training of the employees," "geographic proximity," and "continuity or integration of production processes." *Id*. Given the facts of this case, the majority's ruling that the Board's standard for accretion could not possibly be satisfied, without even remanding to give the Board an opportunity to apply the *Safeway Stores* standard in the first instance, is indefensible.

In sum, it is clear from the record that the employees in the consolidated facilities, whether originally from CooperSmith or Earthgrains, are working as part of a unified operation, and that the Board's accretion order was proper, notwithstanding its failure to apply the *Safeway Stores* standard. Although I conclude that remanding to the Board to apply the *Safeway Stores* standard, given the facts of this case, would be a needless formality, the majority should at least, if it disagrees, remand with instructions to the Board to allow it an opportunity to apply the proper legal standard.

IV.

I concur with the majority that the Board's finding of constructive discharge regarding Thomas Neal is not supported by substantial evidence, although, like the majority, I am satisfied that substantial evidence supports the Board's finding that Earthgrains violated section 8(a)(1) and (3) of the National Labor Relations Act by refusing to promote Neal to route sales representative and by telling him that his filing of a grievance kept him from getting that promotion.

Earthgrains argues that the Board's "Hobson's Choice" theory of constructive discharge is an "arbitrary and irrational" interpretation of the NLRA. I think it important to emphasize, however, that we need not reach the issue of whether the Board's use of the "Hobson's Choice" theory of constructive discharge is permissible under the National Labor Relations Act, because the record lacks substantial evidence to support a finding that Earthgrains constructively discharged Neal, even if we assume, *arguendo*, that the Board's articulated "Hobson's choice" standard is a permissible interpretation of the statute.

Willis' suggestion to Neal that he would have received a promotion had he not filed a grievance through the union did not condition Neal's continued employment *as a depot loader* on the relinquishment of statutory rights. Rather, Willis' statement, at most, conditioned Neal's *advancement within the company* on his abandonment of protected activity. An employer's mere conditioning of some benefit or condition of employment on the relinquishment of statutory rights is not enough, under the Hobson's choice theory, to create a "constructive discharge" if the employee later resigns. If it were, every violation of section 8(a)(3), which prohibits "discrimination in regard to . . . any term or condition of employment to encourage or discourage membership in any labor organization" would present a "Hobson's choice" to employees that would allow them to quit and later claim reinstatement and backpay. The Board has never held that the doctrine of "constructive discharge" is this broad and did not so hold in this case.[8]

---

[8]We need not decide, in this case, whether the NLRA would permit the Board to explicitly adopt, in its caselaw, a policy that treats any

With these observations, I concur in Parts I and III and dissent from Part II of the majority's opinion.

---

employee resignation in response to a section 8(a)(3) unfair labor practice as a constructive discharge that would entitle the employee to reinstatement and backpay. It should be noted, however, that the Board's remedial powers are confined to make-whole remedies, not punitive sanctions, *see NLRB* v. *Pepsi Cola Bottling Co. of Fayetteville, Inc.*, 258 F.3d 305, 314 (4th Cir. 2001), and that backpay awards are contingent upon reasonable efforts by the victims of unfair labor practices to mitigate their damages, *see Coronet Foods, Inc.* v. *National Labor Relations Board*, 158 F.3d 782, 800 (4th Cir. 1998). Any theory of constructive discharge adopted by the Board must comport with these principles.